UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD LEROY SNOW,<br><br>        Petitioner,<br>v.<br><br>DANIEL PARAMO,<br><br>        Respondent | Case No. 14CV536-LAB(BLM)<br><br>**REPORT AND RECOMMENDATION<br>FOR ORDER DENYING PETITION<br>FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge Larry Alan Burns pursuant to 28 U.S.C. § 636(b) and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California. On March 10, 2014, Petitioner Edward Leroy Snow, a state prisoner proceeding *pro se*, commenced these habeas corpus proceedings pursuant to 28 U.S.C. § 2254. ECF No. 1. ("Pet."). Petitioner challenges his conviction of first degree murder. Id. Respondent filed an answer on May 6, 2014 [ECF No. 5-1 ("Answer")] and Petitioner filed a traverse on July 15, 2014 [ECF No. 9 ("Traverse")].

This Court has considered the Petition, Answer, Traverse, and all supporting documents filed by the parties. For the reasons set forth below, this Court **RECOMMENDS** that Petitioner's Petition for Writ of Habeas Corpus be **DENIED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts are taken from the California Court of Appeal's opinion in People v. Snow, Appeal No. D058200, slip op. (Cal. Ct. of App. Sept. 19, 2012). Lodgment 5. This Court

presumes the state court's factual determinations to be correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003); see also Parke v. Raley, 506 U.S. 20, 35 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).

BACKGROUND

Prosecution Evidence

Larry Lemler owned Paxton's Towing (Paxton's), a towing service and impound yard in Chula Vista. The yard had a small office building with two connecting rooms. One room was a dispatcher's office. The other room was Lemler's office. Access to the impound lot was through remote controlled pedestrian and vehicle security gates, which were typically closed. There were 16 security cameras around the impound yard and two inside the office building. The camera system was housed in a locked security box wired to the wall.

Lemler also operated concession stands at local home improvement stores. The concession stands' sales were all in cash, mostly in small denominations. Each day, the concession stand employees packaged the day's cash receipts in yellow sandwich wrap and placed them into a safe. A manager collected the money every third day and brought it to Lemler. Lemler stored the money in large plastic bags under his desk at Paxton's. He counted the money at the end of the month.

Lemler counted and wrapped most of the money other than $1 bills with paper money bands he obtained from his bank. He wrapped the $1 bills with rubber bands. On stacks of money with odd amounts, he wrote the amount on the bills in pencil. He estimated he collected between $65,000 and $80,000 each month from the concession stands.

Snow worked for Paxton's from May through August 2006,FN1 primarily as a tow truck driver. In late July or early August, Snow discussed robbing Paxton's with his coworker, James Myers.FN2 Snow told Myers they could get David Sanders, the night dispatcher, out of the way by knocking him out and putting him in a portable toilet or the trunk of a car.

FN1. Further calendar references are also to the year 2006 unless otherwise indicated.

FN2. Myers admitted having a prior misdemeanor conviction for conduct involving moral turpitude.

Sometime in mid-August, Snow took some money from Lemler's office and paid Myers $1,000 to keep quiet about it. Around the same time, Snow and Myers again discussed robbing Paxton's. A few days after their discussion, in exchange for 20 to 25 percent of the robbery proceeds, Myers agreed to keep himself and another coworker, Terry Taylor,FN3 out of the impound lot during the robbery.

FN3. Taylor admitted having a prior felony theft-related conviction.

Also around the same time, Snow told Lemler he had to go to Kansas because his

grandfather was sick. About 10 days later, Snow told Lemler his grandfather had died and he would be back to work soon. He picked up his pay at the end of August and told Lemler he was ready to return to work, but Lemler never saw him again. Snow told Myers he moved to Kansas and was growing marijuana. Snow similarly told Taylor he was opening a business in Kansas and showed him pictures of his marijuana field.

On September 18 Snow returned to the San Diego area. He checked into a National City hotel and paid for three nights with a credit card. The vehicle listed on Snow's registration card was a 2005 Dodge van. The van's rear window brake light did not work.

That same day, Snow told Taylor he was planning to rob Paxton's on September 20. Snow said two other people were going to help him. They were going to put Sanders in a portable toilet and then Snow was going to take money from Lemler's office. He asked Taylor where the main power switch to the building was and Taylor pointed it out on the office wall. Snow said he would give Taylor $10,000 or 10 percent of the robbery proceeds if Taylor stayed away from the impound lot between 7:30 p.m. and 9:30 p.m. Snow also said Myers would be watching Taylor to make sure Taylor stayed away. He told Taylor that Myers had helped him steal money from Paxton's on four or five prior occasions.

In the evening of September 19 and again in the afternoon of September 20, Snow met with Taylor to acquire methamphetamine for resale in Kansas. On the first occasion, Snow and Taylor discussed the robbery further. Taylor told Snow he did not want to participate in the robbery, but agreed to stay away from Paxton's during the robbery. Snow told Taylor to "keep [his] mouth shut" and everything would be okay. On the second occasion, Snow showed Taylor a chrome and black gun. On both occasions, Snow drove a blue Dodge van.

Meanwhile, Myers had told his wife about the robbery plan and she talked him out of participating. On September 20, Myers phoned Snow, told Snow he did not want anything to do with the robbery, and tried to talk Snow out of going through with it. They subsequently met for lunch and Myers again told Snow he did not want anything to do with the robbery; however, Snow confirmed he was going through with it. He told Myers he did not need him anyway because he had already told Taylor about the robbery plan and Taylor agreed to stay away from Paxton's during the robbery. Snow also told Myers to keep his mouth shut and that he hoped Myers had not said anything to his wife because he did not want to see anything happen to her. This remark frightened Myers.

That day, Lemler worked in his office until about 7:00 p.m. When he left, he locked his office, which had about $89,000 in cash stored in it. At that point, Sanders was alone.

Taylor went to work that day around 5:30 p.m. After towing one vehicle, he returned to Paxton's around 7:15 p.m., where Myers was waiting for him. They left in separate trucks around 7:45 p.m. and planned to stay away until 9:00 p.m. or 10:00 p.m. They went to a park and sat in their trucks. While they waited, Taylor used some drugs. Sanders called Taylor around 8:30 p.m. to unlock a car. Taylor declined to take the job. He and Myers then went to Taylor's house for awhile.
At around 9:30 p.m., Taylor tried to contact Sanders by phone and by radio. When Sanders did not respond, Taylor and Myers drove back to Paxton's. They found the vehicle security gate open and Sanders's body on the ground by the dispatcher's office. His head was bleeding, and there was blood on the ground and the wall.

Myers called 911.

Several police officers responded to the scene. The officers searched the grounds and noticed Taylor and Myers standing near a tow truck. Taylor and Myers directed the officers to Sanders's body. Sanders had two gunshot wounds that were consistent with being caused by a handgun. One of the wounds was to his head and the other was to his neck just behind his ear. He also had minor blunt trauma to his head. There were no signs of a struggle. He died from the gunshot wounds.

Paxton's security camera system was missing. The wires for the system were cut and all of the recording devices and videotapes were gone. Wire cutters lying next to the cut wires contained a mixture of DNA from at least three contributors. Snow could not be excluded as a contributor to the mixture.

Lemler's office door had been forced open and the deadbolt had been ripped out of the wood. A stack of currency on Lemler's desk totaling more than $3,000 and Paxton's cash box and drop safe had not been disturbed. However, a majority of the bags of cash Lemler kept under his desk were gone.

Lemler originally told police about $12,000 was stolen. He later told police about $50,000 to $60,000 was stolen. At the preliminary hearing, he testified that about $90,000 was stolen and, at trial, he testified that about $80,000 was stolen. Lemler did not file an insurance claim for the loss and denied his failure to do so was because he thought the insurance company might investigate the loss.

A security video from the business next door to Paxton's showed a tow truck with a vehicle entered Paxton's at 7:29 p.m. At 7:42 p.m., two tow trucks left Paxton's. At 9:13 p.m., a dark-colored vehicle entered Paxton's. It stopped and waited for approximately 15 seconds for the vehicle security gate to open and then proceeded into the impound lot. The vehicle did not have an illuminated third brake light. At 9:20 p.m., Paxton's yard lights shut off. At 9:21 p.m., the vehicle left Paxton's. At 9:25 p.m., the vehicle returned. This time, the gate was open and the vehicle did not stop. The vehicle left again at 9:26 p.m. At 9:48 p.m., the two tow trucks returned to Paxton's.

On September 21, Taylor called Snow several times. Snow told Taylor he had to shoot Sanders. He also told Taylor not to worry and to keep his mouth shut. Taylor asked Snow how much money he had taken and Snow said he had not counted it. He wanted Taylor to come to Kansas to get his share. Instead, Taylor gave Snow a bank account number and asked Snow to deposit the money into it. Snow never did.

Taylor called Snow about three or four days later and asked him how much money he had taken, guessing it was $15,000 to $20,000. Snow said he had gotten five or six times that amount. He told Taylor he had bought welding equipment and a flat screen television and was living like a king.

Myers also called Snow three or four days after the robbery. Snow bragged that "Wal–Mart loves him" and that he was watching his 52–inch television. Snow also mentioned Myers would be getting "four zeros," meaning $10,000 or more. Snow asked whether Myers and Taylor had talked to the police and told Myers they had better not do so. He also told Myers that Sanders had "never seen it coming."

Although Taylor and Myers were at the scene when police officers arrived, investigators did not consider them suspects. Investigators later learned of their

involvement in the crime through a Crime Stoppers tip. Investigators interviewed both men, who initially lied and then downplayed their involvement. Both men eventually told investigators Snow had killed Sanders during a planned robbery.FN4

FN4. Both men pleaded guilty to voluntary manslaughter for their roles in this crime. Neither had been sentenced at the time of Snow's trial.

On October 10, police officers searched Snow's home in Kansas. They found a duffel bag in Snow's bedroom containing $24,953 in cash, banded in denominations of $1, $5, $10, and $20. A fingerprint expert examined the money and the bands. Snow's fingerprints were on four of the bands. Lemler's fingerprints were not on any of the bands or any of the money. They also found cash in the amount of $8,400 in Snow's pants, consisting of 64 $100 bills and 100 $20 bills. There appeared to be new kitchen appliances and a new flat-screen television in the home. There were also three welding machines, two of which looked new, and one air compressor in the garage.

The officers found a small pipe and $20 or less worth of marijuana along with other drug-related paraphernalia. They did not find "pay and owe" sheets or other items indicating Snow was growing or selling marijuana.

Lemler identified the money found in Snow's residence based on the type and color of the paper bands used, the type of rubber bands used, the numbers written on the bills, and the type of marking system used. The money bands on the bills found in Snow's home matched the money bands supplied by Lemler's bank.

Defense Evidence

Snow's mother testified he visited her in Wyoming for three days between August 16 and 28 on his way to Kansas. He was alone and he had a large amount of money in a coffee can. Snow and his mother went to a bank, got some money bands, and counted and banded the money. It totaled between $30,000 and $38,000, consisting mostly of $1 and $5 bills. Neither Snow nor his mother wrote on any of the money in pencil. Snow used some of the money to buy a house in Kansas.

Snow's father-in-law was a truck driver and a mechanic. He had a compressor, toolboxes and lots of tools, but no welding equipment. He gave Snow a compressor and a toolbox full of tools because Snow wanted to start a welding business.

Snow told his father-in-law he sold marijuana. His father-in-law thought Snow sold marijuana in Kansas and that his money was from marijuana sales. Snow told his father-in-law he paid cash for the house in Kansas. His father-in-law thought the house cost less than $20,000. Neither Snow nor his wife had a job in Kansas. While in San Diego, they lived with Snow's mother-in-law rent free to save money for Snow to start a business. Snow's father-in-law also gave them money for living expenses so Snow could start a business, but he did not buy them a house, a flat screen television, a refrigerator, or a stove.

Lodgment 5 at 2-9.

On June 13, 2007, the People of the State of California filed a felony complaint charging Petition with murder. Lodgment 1 at 1. Following a jury trial, the jury found Petitioner guilty

of first degree murder. Id. at 770. On September 8, 2010, the trial judge sentenced Petitioner to an indeterminate term of fifty years to life. Id.

On November 11, 2011, Petitioner appealed his conviction arguing that (1) his "due process rights were violated when the prosecutor failed to disclose material evidence to defense counsel regarding the District Attorney's simultaneous investigation of Bo Lemler for insurance fraud during" Petitioner's trial, (2) the court erred when it admitted evidence of guns found in Petitioner's home to corroborate a witness's testimony that he saw Petitioner with a handgun a few days before the shooting, and (3) that cumulative errors deprived Petitioner of a fair trial as required by the Fourteenth Amendment. Lodgment 3. On September 19, 2012, the court of appeal published a written opinion affirming the judgment of the trial court. Lodgment 5. On October 16, 2012, Petitioner filed a petition for review in the California Supreme Court, raising the claim that the evidence withheld in violation of Brady v. Maryland, 383 U.S. 83 (1963) was material because its nondisclosure "undermines confidence in the outcome of the trial, regardless of whether the evidence was sufficient to uphold a conviction." Lodgment 6. The California Supreme Court denied the petition for review on December 21, 2012. Lodgment 7.

On January 2, 2014, Petitioner filed a petition for writ of habeas corpus in the San Diego Superior Court arguing that he received ineffective assistance of counsel. Lodgment 8. The court denied the petition on January 29, 2014 noting that "[u]nder the circumstances of this case, Petitioner's claim of ineffective assistance of counsel could and should have been brought on appeal." Lodgment 9.

Petitioner began federal habeas proceedings on March 10, 2014, when he filed his Petition for Writ of Habeas Corpus. Pet. In the petition, Petitioner alleges that his due process rights were violated when the prosecutor failed to disclose material evidence under Brady. Pet at 6, 50. Respondent filed an answer to the petition on May 6, 2014 and lodged the relevant state court records. ECF Nos. 5 and 6. Petitioner filed a traverse on July 17, 2014. ECF No. 9.

## SCOPE OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254(a).

The Petition was filed after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In making this determination, a court may consider a lower court's analysis. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991) (authorizing a reviewing court to look through to the last reasoned state court decision).  Summary denials are presumed to constitute adjudications on the merits unless "there is reason to think some other explanation for the state court's decision is more likely." Harrington v. Richter, 131 S.Ct. 770, 784-785 (2011).

A state court's decision is "contrary to" clearly established federal law if the state court: (1) "applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

A state court's decision is an "unreasonable application" of clearly established federal law where the state court "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413).  "[A] federal habeas court may not issue [a] writ simply because that court concludes in its independent judgment

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must be objectively unreasonable." Id. at 75-76 (citations and internal quotation marks omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.

If the state court provided no explanation of its reasoning, "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Harrington, 131 S.Ct. at 786. In other words, a federal court may not grant habeas relief if any fairminded jurist could find the state court's ruling consistent with relevant Supreme Court precedent.

Finally, habeas relief also is available if the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (1996); Wood v. Allen, 558 US 290, 293 (2010). A state court's decision will not be overturned on factual grounds unless this Court finds that the state court's factual determinations were objectively unreasonable in light of the evidence presented in state court. See Miller-El, 537 U.S. at 340; see also Rice v. Collins, 546 U.S. 333, 341-42 (2006) (the fact that "[r]easonable minds reviewing the record might disagree" does not render a decision objectively unreasonable). This Court will presume that the state court's factual findings are correct, and Petitioner may overcome that presumption only by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1); Schriro v. Landrigan, 550 U.S. 465, 473-474 (2007).

## DISCUSSION

Petitioner raises one ground for relief in his petition, that his due process rights were violated when the prosecutor failed to disclose material evidence under Brady. Pet. at 6, 50. In support, Petitioner argues that the state court's opinion was both "contrary to, and an unreasonable application of Federal law as determined by the United States Supreme Court, as

well as an unreasonable determination of the facts in light of the facts presented in the state court proceeding." Id. at 66. Petitioner argues that the fraud investigation evidence against witness Bo Lemler which was withheld by the District Attorney's office was material because Mr. Lemler was a key prosecution witness. Id. at 67-68. Petitioner argues that the fraud evidence would have shown the jury that Mr. Lemler was engaged in crimes of moral turpitude and an "accomplished liar" which would have impacted his credibility with the jury. Id. at 68. Petitioner argues that witness credibility was key to his case which had "little physical evidence linking [him] to the murder." Id. at 69; see also Traverse.

Respondent contends that the state court's rejection of Petitioner's Brady claim was reasonable. Answer at 14. In support, Respondent contends that Petitioner "has failed to show that any favorable material evidence was suppressed by the prosecutor." Id. at 20. Respondent concludes that "it cannot be concluded that there was 'no reasonable basis for the [state appellate court's] decision or that no fair-minded jurist could agree with the state court.'" Id. (internal citations omitted).

Petitioner presented his claim to the California Supreme Court in a petition for review. Lodgment 6. The petition for review was summarily denied without a statement of reasoning or citation of authority. Lodgment 7. Petitioner presented his claim to the appellate court in a manner similar to the one that was presented to the state supreme court. Lodgment 3. The appellate court denied the claim in a reasoned opinion. Lodgment 5. The Court will therefore look through the silent denial by the state supreme court to the appellate court opinion. Ylst, 501 U.S. at 804. In denying the appeal, the appellate court stated the following:

Prosecutor's Failure To Disclose Evidence

A

More than a year after the jury returned its verdict, defense counsel FN5 moved for new trial on the ground, among others, that the prosecution violated its discovery obligations under Brady, supra, 373 U.S. 83. At the evidentiary hearing on the motion, the evidence showed that, at the time of Snow's trial, the district attorney's office was investigating Lemler for workers' compensation insurance fraud, employment tax fraud and consumer fraud (predatory towing). The district attorney's office learned of the worker's compensation insurance and employment tax fraud claims approximately a year and a half before trial. The prosecutor learned of them approximately five months before trial. The district attorney's

office learned about the consumer fraud claim approximately a month before trial. It is unclear from the record when the prosecutor learned of the consumer fraud claim. However, the prosecutor did not disclose the fraud investigations to defense counsel until approximately nine months after Snow's trial, when, following an *in camera* review, the trial court ordered disclosure of the information.

FN5. By then, the trial court had relieved Snow's retained trial counsel at Snow's request and appointed a public defender to represent him in posttrial matters. After the hearing on the motion for new trial, the trial court found the prosecution willfully failed to properly discharge its discovery obligations, FN6 but the undisclosed evidence was not material because it was not reasonably probable use of the undisclosed evidence would have resulted in a different trial outcome. The trial court reasoned it would have limited the use of the evidence under Evidence Code section 352; Snow's defense counsel rigorously cross-examined Lemler about his loss estimates, his operation of cash businesses, and his failure/unwillingness to make an insurance claim; Lemler's testimony about his money marking method was coherent and credible; and Lemler's testimony was not critical given Taylor's and Myer's testimony, which was corroborated by cell phone records.

FN6. Because the People are not disputing this finding, we omit a summary of the facts underlying it. We note, however, the record amply supports the finding.

B

Snow contends the trial court erred in denying his motion for new trial because the trial court mistakenly determined the prosecution had not violated Brady, supra, 373 U.S. 83. " 'In Brady, the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." [Citation.] The high court has since held that the duty to disclose such evidence exists even though there has been no request by the accused [citation], that the duty encompasses impeachment evidence as well as exculpatory evidence [citation], and that the duty extends even to evidence known only to police investigators and not to the prosecutor [citation]. Such evidence is material " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " [Citation.] In order to comply with Brady, therefore, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." ' " (People v. Letner (2010) 50 Cal.4th 99, 175 (Letner).)

A Brady violation has three components: " ' "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." [Citation.] Prejudice, in this context, focuses on "the materiality of the evidence to the issue of guilt and innocence." [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation], that the absence of the suppressed evidence made conviction "more likely" [citation], or that using the suppressed evidence to discredit a witness's testimony "might have changed the outcome of the trial" [citation]. A defendant instead "must show a 'reasonable probability of a different result.' " [Citation.]' [Citation.] We independently review

> the question whether a Brady violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (<u>Letner</u>, <u>supra</u>, 50 Cal.4th at p. 176.)
>
> The first two components of a <u>Brady</u> violation are satisfied in this case. The prosecution had an obligation to disclose the fraud investigation evidence because "the circumstance that a prosecution witness faced pending criminal matters, some of which were being prosecuted by the same district attorney's office prosecuting the defendant, constitutes evidence 'favorable' to the defense, in that a jury could view this circumstance as negatively impacting the credibility of testimony by the witness that was helpful to the prosecution." (<u>Letner</u>, <u>supra</u>, 50 Cal.4th at p. 176.)
>
> We, nonetheless, agree with the trial court the fraud investigation evidence was not material. " ' "In general, impeachment evidence has been found to be material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime,' [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case, [citation]." ' " (<u>Letner</u>, <u>supra</u>, 50 Cal.4th at p. 177.) Neither circumstance applies here. Lemler's testimony did not supply the only evidence linking Snow to the crime. Myers's and Taylor's testimony also linked Snow to the crime and arguably did so as strongly or more strongly than Lemler's testimony since they were Snow's coconspirators and their testimony was corroborated by cell phone records.
>
> Although Lemler's testimony supplied key evidence linking the cash found in Snow's home to the crime, the fraud investigation evidence would not have undermined this aspect of Lemler's testimony. As the trial court noted, Lemler's testimony describing how he counted and banded his money, the materials he used to band his money, and his method of marking stacks of money with odd amounts was internally consistent and not inherently incredible. In addition, after the discovery of the banded cash in Snow's home, a detective obtained sample cash bands from Lemler and from Lemler's bank. The sample bands were consistent with the bands used on the cash found in Snow's home, corroborating Lemler's testimony.
>
> Moreover, the jury already knew from Lemler's testimony that he paid most of his employees in cash. They also knew from Myer's testimony that Lemler required his employees to tow cars illegally. Given this testimony and Lemler's unconventional cash management practices, it is doubtful the fraud investigation evidence would have surprised the jury or appreciably affected the jury's assessment of Lemler's credibility. To the contrary, the fraud investigation evidence might have bolstered Lemler's credibility in some respects because the evidence would have helped explain why Lemler had bags of cash stashed under his desk, why he could not give a precise accounting of the stolen money, and why he did not report the theft to his insurance company. Accordingly, we conclude the fraud investigation was not material within the meaning of <u>Brady</u>, <u>supra</u>, 373 [sic] U.S. 83 and the trial court did not err in denying Snow's new trial motion on this ground.

Lodgment 5 at 10-14.

The United States Supreme Court has held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the

prosecution." Brady, 383 U.S. at 87. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985). To prevail on a Brady claim, a petitioner must show that: (1) the evidence was exculpatory or impeaching; (2) the evidence was suppressed by the State; and (3) the suppression resulted in prejudice. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). In determining prejudice, the question is "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 290 (quoting Kyles v. Whitley, 514 U.S. 419 (1995)).

Here, the appellate court determined that the first two elements were present [Lodgment 5 at 12-13] and this Court accepts that determination. In concluding that the third element was not satisfied, the appellate court determined that the withheld information regarding the fraud investigation of Mr. Lemler was not material because it was not likely to have affected the verdict and therefore did not prejudice Petitioner. Id. at 13-14. There is substantial evidence in the record supporting the appellate court's conclusion.

First, Mr. Lemler's testimony was not critical to the jury's guilty verdict because there was a significant amount of other evidence, including the testimony of two individuals who participated in the criminal conduct, supporting the verdict. Strickler, 527 U.S. at 290 ("[t]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict'"). In summary, Mr. Lemler testified that he maintained a large amount of cash under his desk in his office, that a large amount of money was stolen on the night of the murder, that he did not file an insurance claim, and that based on the bands around the money, the money found at Petitioner's home belonged to Lemler. Lodgment 2 at 167-269. While this evidence provides motive for the robbery and some evidence connecting Petitioner to the stolen money, it is not the most powerful evidence of guilt presented during the trial.

In contrast, two of Petitioner's co-workers provided extremely inculpatory testimony. Mr.

James Myers testified that Petitioner once stole money from Paxton's and paid him $1,000 to "keep [his] mouth shut." Lodgment 2 at 526. Mr. Myers further testified that on several occasions, Petitioner discussed robbing Paxton's and how easy it would be if he could just get Dave Sanders, a Paxton employee, out of the way so the robbery could take place. Id. at 527-529. Mr. Myers stated that Petitioner asked him to get involved with the robbery by keeping Terry Taylor, another employee out of the yard in exchange for 20 to 25 percent of the proceeds form the robbery. Id. at 529-33. Mr. Myer initially agreed to participate, but after discussing it with his wife changed his mind. Id. at 531-532. During this time, Mr. Myer testified that there were several phone calls between himself and Petitioner. Id. at 531-532, 576-586. When Mr. Myers communicated his change of heart to Petitioner, Petitioner responded by saying "I hope you didn't tell your wife. I don't want to see anything happen to her." Id. at 535. Mr. Myer testified that he went to work the evening of the murder and while there, Mr. Taylor informed him that he had spoken with Petitioner and knew about the robbery. Id. at 540. That evening Mr. Myer and Mr. Taylor returned to the yard after driving around in their tow trucks and found Mr. Sanders lying on the ground bleeding. Id. at 546. Mr. Myers testified that a few days later, he spoke with Petitioner who was bragging about all the money he had spent at WalMart and the new 52 inch television he was watching. Id. at 555. Petitioner told Mr. Myers that "Old Dave never saw it coming" and warned Mr. Myers not to speak to the police. Id.

Mr. Taylor testified that two days before the robbery and murder, Petitioner spoke with him about the robbery and wanted information on the power switches at Paxton's in case he decided to shut down the power. Id. at 316-318. Mr. Taylor stated that Petitioner told him to stay away from the yard on September 20th when the robbery would take place. Id. at 318. Mr. Taylor also testified that Petitioner offered to pay him $10,000 or 10% of what he got from the robbery if Mr. Taylor stayed away from the lot. Id. at 321. Specifically, Mr. Taylor testified that Petitioner told him to stay away from about 7:30 - 9:30 p.m. Id. at 321. Mr. Taylor further testified that the next day Petitioner mentioned the robbery again and told him to keep his mouth shut, to not tow any cars during the set time period, and that everything would be okay. Id. at 324. Petitioner also told Mr. Taylor that Mr. Myers was going to watch him and make sure

that he stayed away from the lot. Id. Mr. Taylor testified that the day after the robbery/murder he called Petitioner to ask him why he shot Mr. Sanders and Petitioner stated that "we had to do it so don't – just don't worry about it. Just keep your mouth shut." Id. at 356. A few days later during another call with Petitioner, Mr. Taylor asked Petitioner how much money he got from the robbery and Petitioner responded that he got about five or six times the $15,000 or $20,000 that Mr. Taylor had guessed. Id. at 357. Given all of the strong evidence of guilt provided by Mr. Myers and Mr. Taylor, and the minimal value of Mr. Lemler's testimony, the fact that Mr. Lemler was being investigated for fraud was not likely to affect the jury's verdict. See Bagley, 473 U.S. at 682 (issue is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

Second, the withheld evidence was not material because Mr. Lemler's credibility already was dramatically undermined during the trial by his cross-examination and the testimony of other witnesses, both of which suggested illegal or fraudulent activities by Mr. Lemler. Gloeckner v. Youngblood, 2012 WL 6719557, *7 (E.D. Cal. Dec. 26, 2012) (stating that "undisclosed impeachment evidence is not material under Brady if it would not have added significantly to the cumulative impact of other impeachment evidence already presented") (citing People v. Dickey (2005) 35 Cal. 4th 884, 907–90); see also Williams v. Woodford, 384 F.3d 567, 599 (9th Cir. 2004) (where impeachment evidence is cumulative of evidence presented at trial, and the impeachment evidence would not cast the witness in a significantly worse light, there is no reasonable probability that the proceedings would have been different). Specifically, Mr. Myers testified that Mr. Lemler required his employees to illegally tow vehicles. Lodgment 2 at 539. Mr. Myers also testified that Mr. Lemler paid all of his employees in cash and that taxes were not taken out of the money. Id. at 608.

Mr. Lemler testified that he had a concession stand business and that the cash money from each concession stand was brought to his office at Paxton's every third day where he would store it under his desk in Ziplock bags for three to five weeks before counting it. Id. at 167-168. Mr. Lemler stated that he could have anywhere from $30,000 to $80,000 sitting in his office

depending upon what month it was. Id. at 170. Mr. Lemler also testified that he paid his employees in cash. Id. at 188. He further testified that he initially told police that he believed that about $12,000 had been stolen, but that by the preliminary hearing, Mr. Lemler testified that the loss was actually $90,000. Id. at 259-262. Mr. Lemler also stated that he did not file an insurance claim for the stolen money because despite having been a business man for the past thirty-five years, the thought "did not cross [his] mind." He further testified that his decision not to file an insurance claim was not because he was concerned that the insurance company may investigate the loss. Id. at 263-264.

While the withheld evidence certainly would have challenged Mr. Lemler's honesty and may have further negatively impacted his credibility, it is unlikely that the evidence would have caused the jury to question Mr. Lemler's testimony linking the money found in Petitioner's home to the money taken during the robbery. Mr. Lemler provided police with a description of his accounting practices, including the manner in which he bound, stacked, and marked his money and the products that he used to do so. Id. at 167-172 and 265-269. This testimony was supported in part by evidence and information that the police were able to obtain from Mr. Lemler's bank. Id. at 990-992, 995.

Finally, the withheld evidence was not material within the meaning of Brady even after considering its cumulative effect. See Kyles v. Whitley, 514 U.S. 419, 436–37 and n. 10 (1995) (after evaluating the tendency and force of the undisclosed evidence item by item, the court next evaluates its cumulative or collective effect for purposes of materiality); Barker v. Fleming, 423 F.3d 1085, 1094-1095 (9th Cir. 2005) (stating that "[O]ur materiality analysis is not complete until we consider the cumulative effect of the suppressed evidence."). Here, the cumulative effect of the testimony of Mr. Myers and Mr. Taylor likely had a larger impact on the jury with respect to Petitioner's guilt than the testimony of Mr. Lemler and the likely effect of the withheld evidence on Mr. Lemler's credibility. While it is true that Mr. Lemler's testimony provided a link between the money that was stolen from Paxton's and the money that was found in Petitioner's home, it was the testimony of Mr. Myers and Mr. Taylor that was key to the prosecution's case and that provided the jury with details about Petitioner's plans to steal money from Mr. Lemler,

his need to prevent Mr. Sanders from interfering with the robbery, and the subsequent murder of Mr. Sanders. Barker, 423 F.3d at 1101 (finding that withheld evidence was not material where the witness who would have been impeached by the evidence "was not the glue holding together the prosecution's case nor would heaped-on impeachment evidence have altered his already shattered credibility") (citing Benn v. Lambert, 283 F.3d 1040, 1054 (9th Cir. 2002) (evidence was material when witness who would have been impeached was "critical" to the prosecution)). Moreover, the link between the money found in Petitioner's home and Paxton's money also was provided by the officers' testimony so even if the jury completely discounted everything Mr. Lemler said, there still was overwhelming evidence supporting the jury's verdict.

Because Mr. Lemler's credibility was undermined by the evidence presented during trial and because there was substantial evidence in addition to Mr. Lemler's testimony supporting the guilty verdict, the Court finds that the state court's decision that the withheld evidence was not material was not an unreasonable application of the clearly established federal law or contrary to clearly established federal law. Accordingly, the Court **RECOMMENDS** that Petitioner's Petition be **DENIED**.

## CONCLUSION AND RECOMMENDATION

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the District Judge issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than **October 6, 2014**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

///
///
///
///
///
///

1  ///
2  ///
3  ///
4       **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court
5  and served on all parties no later that **October 31, 2014**.  The parties are advised that failure
6  to file objections within the specified time may waive the right to raise those objections on
7  appeal of the Court's order.  See <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998).
8       **IT IS SO ORDERED.**
9  DATED: September 9, 2014

                         *Barbara L. Major (signature)*

                        BARBARA L. MAJOR
                        United States Magistrate Judge